# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA
### CHARLESTON DIVISION

| | | |
|---|---|---|
| JANE DOE, a minor, by her Guardian and Parent, SALLY DOE, | ) | |
| | ) | |
| Plaintiff, | ) | No. 2:14-cv-01873-DCN |
| | ) | |
| vs. | ) | |
| | ) | **ORDER** |
| GEORGETOWN COUNTY SCHOOL DISTRICT and DENETTA MCCRAY, | ) | |
| | ) | |
| Defendants. | ) | |

This matter comes before the court on defendants Georgetown County School District ("District") and Denetta McCray's ("McCray") (collectively "defendants") motion for summary judgment. For the reasons set forth below, the court grants defendants' motion for summary judgment as to all of plaintiff's federal claims and dismisses plaintiff's state law claims without prejudice.

## I.  BACKGROUND

Jane Doe ("Doe") is a minor student at Georgetown High School ("School"). Compl. ¶¶ 4–5. Jane Doe and Sally Doe ("Ms. Doe") are residents of Georgetown County. Id. Ms. Doe is Doe's mother. Id. ¶ 7. McCray is an employee of the School who works in the front office and serves as the varsity cheerleading coach. Id. ¶ 9. McCray became the cheerleading coach in August 2013 after the former coach was fired for using the term "bitch" during cheerleading practice. Pl.'s Resp. 3. In 2013, Doe was a sophomore at the School and cheered on the varsity cheerleading squad. Defs.' Mot. 1.

1

On Wednesday October 30, 2013, the cheerleaders turned in their report cards to McCray.  Defs.' Mot. 10.  After Doe showed McCray a failing grade on her report card, McCray stated that they would discuss it later.  Doe Depo. 27:16–20.  McCray then addressed the entire squad and asked the girls to raise their hands if they did not have the grades required to cheer during the Friday night football game.  Doe Depo. 28:6; 29:5.  Doe did not raise her hand.  Id.

Shortly thereafter, the squad was sitting in a circle going over cheers and McCray asked the squad where they should put their arms during the cheer.  Doe responded "below your collar bone," and McCray responded that the placement would not be the same for the other girls because not everyone has "saggy boobs" like Doe.  Doe Depo. 31:10–32:21.  Doe then turned her chair so that her back was facing McCray, but McCray turned Doe's chair back around and continued to "pick on" Doe.  Doe stated:  "Ms. McCray, you're bullying me."  Doe Depo. 34:1–3.  McCray responded:  "Honey, you don't know what a bully is."  Doe Depo. 35:4.  Doe alleges that McCray continued to make jokes, causing the other girls to laugh at her.  Doe Depo. 56:1–24.

After practice, Doe's friend told Ms. Doe about the incident.  Doe Depo. 48:3–12.  Ms. Doe called McCray that evening.  McCray admitted that she made the statement but told Ms. Doe that she was joking with Doe and asked Ms. Doe if she could come to their house that evening to discuss the incident with Doe and apologize.  S. Doe. Depo 49:19–50:6.  Ms. Doe declined McCray's offer.  S. Doe Depo 54:10–12.  Ms. Doe tried to talk to her daughter about the incident that night but Doe said she did not want to talk about it.  S. Doe Depo 49:5–8.

The following day on October 31, 2013, Ms. Doe went to the School to meet with the principal, Craig Evans ("Evans"). Ms. Doe told Evans about the incident and stated that although she did not want McCray fired, she did not want McCray to speak to Doe that way. S. Doe Depo. 57:10–17; 58:7–14. After meeting with Ms. Doe, Evans met with McCray. McCray admitted to making the "saggy boobs" comment. Evans Depo. 13:22, 14:3. Evans instructed McCray not to make any further comments to cheerleaders regarding body parts and issued a verbal reprimand based on an "inappropriate conversation with a cheerleader." Evans Depo. Ex. 11. Evans reported the incident to the Director of the District's Human Resources Department, Jon Tester ("Tester"). Evans Depo. 14:15. Tester subsequently reported the incident to Dr. Randall Dozier ("Dozier"), the District Superintendent. Tester Depo. 18:7–21.

After meeting with McCray, Evans contacted Ms. Doe and assured her that he directed McCray not to speak with the cheerleaders about anything other than cheering. He also told Ms. Doe that McCray wanted to apologize to Doe, but Ms. Doe told Evans that she did not want the subject spoken about again. S. Doe Depo. 58:20–59:1. The next day, Friday, November 1, McCray addressed the squad while they were gathering prior to the football game. Doe alleges that McCray stated that "it has been brought to my attention that I have offended someone in here—or I made an offense to someone in there; if I have ever offended anyone, could you raise your hand." Doe Depo. 40:10–22. Doe did not raise her hand, but understood McCray's statement as referring to the incident from the prior day. Doe Depo. 41:10–20. Doe was upset because she felt that McCray called her out in front of everyone. Doe Depo. 43:8–13.

After the football game, Ms. Doe confronted Evans about McCray's pre-game comments to the squad. According to Evans, Ms. Doe yelled at him and insisted he do something about it. Evans Depo. 12:6–14. The following Monday, Evans reported the Friday incident to Tester and Dr. Celeste Pringle ("Pringle"), Deputy Superintendent of the District. Evans Depo. 29:8–10. Evans also discussed the incident with McCray and at least one other cheerleader. Evans Depo. 15:5–16, 17:23, 18:11. The District then placed McCray on administrative leave and suspended cheerleading practice until further notice. Tester Depo. 41:25, 42:6. Evans turned the matter over to Pringle and the Human Resources Department to conduct their investigation. Evans Depo. 21:23–22:4.

The following morning, Ms. Doe and her husband went to Evans' office. Ms. Doe was very upset during the unscheduled meeting, and the Does expressed their desire to have McCray removed as the cheerleading coach. Evans Depo. Ex. 10. Ms. Doe told Evans that she had discussed the matter with an attorney. After the meeting, Ms. Doe understood that McCray would be removed as cheerleading coach. S. Doe Depo. 70:15–71:3.

Two weeks later, cheerleading practice resumed with McCray serving again as cheerleading coach. The day practice resumed, Ms. Doe and her husband picked Doe up from school and took her immediately to the District Office to meet with Dozier and Pringle. S. Doe Depo. 100:21–101:7. Dozier asked Doe to prepare a written statement about the incident to document her complaints. S. Doe Depo. 101:6–12; Doe Depo. Ex. 1. Tester agreed that a further investigation was necessary, but asked Myrtle Morris ("Morris"), the only female administrator in the Human Resources Department, to investigate. Tester Depo. 19:12–20:9. Morris also had a daughter on the cheerleading

4

squad.  Morris spoke with Ms. Doe and obtained Doe's written statement in lieu of an

interview.  S. Doe Depo. 100:11–12; Doe Depo 80:6–16.  Morris interviewed McCray

and also obtained a written statement from her.  Tester Depo. Ex. 1 at 3.  McCray

admitted using the phrase "saggy boobs" about Doe, but stated that Doe first discussed

her boobs in front of McCray and the other cheerleaders.  Morris Depo. 15:10–12, 24:10–

14; Test Depo. Ex.1 at 4.  Morris did not interview any other cheerleaders.  Morris Depo.

14:11, 16:24–17:1.

After completing her investigation, Morris determined that McCray's use of the

phrase "saggy boobs" was inappropriate but did not warrant her removal as the

cheerleading coach.  Tester Depo. Ex. 2.  Morris believed that Doe initiated the topic of

conversation, but that the comment was inappropriate under any circumstances.  She also

concluded that McCray's statements did not constitute bullying.  Morris Depo. 15:14–16,

16:23.

On November 21, 2013, Morris and Evans met with Ms. Doe and her husband to

notify them that the investigation was complete and that the District would not be taking

any further disciplinary action.  During their meeting, Ms. Doe accused them of a conflict

of interest because Morris's daughter was on the squad.  S. Doe Depo. 98:3–6.  Morris

offered counseling for Doe, but Ms. Doe refused.  Morris Depo. 17:8–17.  After Ms. Doe

made the conflict of interest allegations, the District assigned Dr. Marthena Grate Morant

("Morant"), the District's Title IX Coordinator, to review Morris's investigation.  Tester

Depo. 24:1–15.  Morant concluded that McCray's statements were inappropriate and

displayed a lack of judgment, but found the verbal reprimand and suspension suitable.

Morant further concluded that McCray's actions did not constitute sexual harassment or

bullying and that she did not violate the District's sexual harassment and bullying policies. Morant Depo. 16:8–16, 18:17, 19:13.

The District assigned Donna Reed, a former employee, to monitor and assist McCray with the cheerleading squad. Tester Depo. 25:8–20. In her response in opposition to defendants' motion, Doe alleges that the District did not do so until after she filed the present action, but Tester claims that the District took such action "because of the concern of the parents." Tester Depo. 25:18–20. However, Doe filed the action in May 2014 and testified that the assistant coach was in place during her sophomore year of 2013–2014. Doe Depo. 50:12, 51:5. Doe alleges that during the year following the investigation, McCray engaged in retaliatory behavior, including sitting directly behind her at basketball games, criticizing her for not cheering loud enough, saying negative things about her during the annual cheer banquet, benching her during a football game for an excused absence at practice, and inquiring about Doe's health in the nurse's office. Although Doe continued to participate on the cheerleading squad for the remainder of the 2013—2014 school year and the following 2014–2015 school year, she decided not to participate during the 2015–2016 school year. Doe alleges that two other students quit the squad because of McCray. Doe Depo. 82:3–13, 83:4–24. Prior to the incident, McCray worked for the District for 25 years and had no disciplinary issues. Evans received one prior complaint that McCray "was not as pleasant as she could be" in the front office. Evans was aware that one cheerleader quit the squad because "she did not share McCray's philosophy." Evans Depo. 37:3–9.

Doe filed the present action on May 9, 2014. Doe filed an amended complaint on September 26, 2014. Doe brings the following causes of action: (1) violation of Doe's

6

substantive due process rights under the Fourteenth Amendment pursuant to 42 U.S.C. § 1983 against McCray and the District; (2) hostile educational environment in violation of Title IX pursuant to 20 U.S.C. § 1681(a) against the District; (3) negligence per se against McCray and the District; (4) gross negligence against McCray and the District; (5) intrusion and invasion of privacy against McCray and the District; and (6) injunction against the District.  On July 20, 2015, defendants filed a motion for summary judgment. Doe filed a response in opposition to defendants' motion on August 12, 2015, and defendants filed a reply on August 24, 2015.  The motion has been fully briefed and is now ripe for the court's review.

## II.  STANDARD

Summary judgment shall be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id. at 248.  "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249.  When the party moving for summary judgment does not bear the ultimate burden of persuasion at trial, it may discharge its burden by demonstrating to the court that there is an absence of evidence to support the non-moving party's case.  Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).  The non-movant must then "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.  The court should view the evidence in the light most favorable to the non-moving party and draw all inferences in its favor.  Anderson, 477 U.S. at 255.

## III.   DISCUSSION

### A.    Doe's § 1983 Claims against McCray

In her first cause of action, Doe alleges that McCray violated her substantive due process rights to personal security and bodily integrity under the Fourteenth Amendment. Am. Compl. ¶¶ 45–48.  Defendants argue that McCray's alleged sexual harassment did not violate Doe's substantive due process rights because it was limited to verbal statements without physical contact and does not shock the conscience.  Defendants further argue that McCray is entitled to qualified immunity.  In response, Doe argues that McCray's actions were not limited to verbal statements but were accompanied by physical contact.  Doe further argues that McCray's actions shock the conscience and that McCray is not entitled to qualified immunity.

Section 1983 imposes liability on state actors who cause the "deprivation of any rights, privileges, or immunities secured by the Constitution."  "Under established

8

precedent, these constitutional rights include a Fourteenth Amendment substantive due process right against state actor conduct that deprives an individual of bodily integrity." Doe v. Rosa, 795 F.3d 429, 436–37 (4th Cir. 2015).  "[S]ubstantive due process protections guard against 'state action so arbitrary and irrational, so unjustified by any circumstance or governmental interest, as to be literally incapable of avoidance by any pre-deprivation procedural protections or of adequate rectification by any post-deprivation state remedies.'"  J.S. ex rel. Simpson v. Thorsen, 766 F. Supp. 2d 695, 704 (E.D. Va. 2011) (quoting Rucker v. Harford Cnty., 946 F.2d 278, 281 (4th Cir. 1991)).

     The Due Process Clause of the Fourteenth Amendment "does not apply to ordinary governmental neglect, bad policy or inaction, but rather 'only the most egregious official conduct can be said to be arbitrary in the constitutional sense.'"  Id. at 705 (quoting Waybright v. Frederick Cnty., Md., Dep't of Fire & Rescue Servs., 528 F.3d 199, 204 (4th Cir. 2008)).  The Supreme Court has consistently limited the reach of the Due Process Clause, and the Fourth Circuit has gleaned two principles from the Court's continued limitation:  (1) valid due process claims "[i]nvolve a certain sense of constitutional magnitude," and the courts should therefore apply it to cases involving "'only the most egregious official conduct,'" Waybright, 528 F.3d at 204 (quoting Cnty. of Sacramento v. Lewis, 523 U.S. 833, 846 (1998)), and (2) when a court extends the reach of the Due Process Clause, a "concern for the authority of state governments over areas traditionally assigned to state law" is necessarily implicated, id. at 205.  Thus, the Fourth Circuit has repeatedly held that conduct that is "wrong enough to register on a due process scale" is conduct that "'shocks the conscience,' and nothing less."  Id. at 204.

There is no evidence in the record from which a reasonable jury could determine that McCray's actions shock the conscience to rise to a substantive due process violation. "Guidance on what 'shocks the conscience' in a teacher-student sexual harassment case is scant."  Blake v. Radcliff, 2005 WL 1377883, at *3 (S.D.W. Va. June 8, 2005). However, words alone are rarely, if ever, found to "shock the conscience."  Bridges ex rel. D.B. v. Scranton Sch. Dist., 66 F. Supp. 3d 570, 585 (M.D. Pa. 2014) (internal quotation marks omitted) (compiling cases that have noted that verbal abuse generally does not give rise to a constitutional violation under § 1983 and recognizing that "[t]hose courts that have considered instances of psychological or verbal abuse by government actors have typically held that such conduct alone was not severe enough to qualify as a constitutional tort actionable under § 1983"); Abeyta By & Through Martinez v. Chama Valley Indep. Sch. Dist., No. 19, 77 F.3d 1253, 1256 (10th Cir. 1996) ("[E]ven extreme verbal abuse typically is insufficient to establish a constitutional deprivation.").

Further, even when the verbal conduct is extreme and/or coupled with physical conduct, courts rarely expand the Due Process clause under such circumstances.  See, e.g., Bridges, 66 F. Supp. 3d at 576 (no substantive due process violation when plaintiff, the only African-American student in his class, alleged that the teacher called him a dummy, stupid, and lazy, made him sit by an open window in the winter, threw his desk on the floor on more than one occasion, and turned his desk over and shook everything out of it); Gilliam v. USD No. 244 Sch. Dist., 397 F. Supp. 2d 1282, 1287 (D. Kan. 2005) (no substantive due process violation when a teacher inappropriately put his arm around a student, touched her by leaning over her desk, and rubbed up against her one time when he pressed his torso into her back); Costello v. Mitchell Pub. Sch. Dist. 79, 266 F.3d 916,

919 (8th Cir. 2001) (no substantive due process violation when a teacher "daily called [the plaintiff] 'retarded,' 'stupid,' and 'dumb,' in front of her classmates[,] . . . threw [a] notebook at her, hit[] her in the face . . . [and] told her that she could no longer play in the band because she was too stupid and that he did not have to teach students like her and that he would not"); Abeyta, 77 F.3d at 1256 (no substantive due process violation when plaintiff's teacher called her a prostitute and allowed other classmates to taunt her over a period of weeks).

     Viewed in the light most favorable to Doe, McCray's verbal comments were coupled with physical conduct because she turned Doe's chair around after making the "saggy boobs" comment.  However, regardless of whether McCray's alleged harassing statements were coupled with physical conduct, her actions do not shock the conscience. Doe does not allege that McCray sexually assaulted or molested her.  While McCray's comment was undoubtedly unprofessional and inappropriate, her actions as alleged are clearly insufficient to support a substantive due process claim.  Given the Supreme Court's consistent reticence to expand the reach of substantive due process, McCray's actions clearly do not fall within that limited reach.

     Therefore, the court grants defendants' summary judgment motion as it pertains to Doe's § 1983 claim against McCray.[1]

_____

[1]     Even if the court were to find that McCray violated Doe's substantive due process rights, she would be entitled to qualified immunity.  The doctrine of qualified immunity protects government officials performing discretionary functions "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009).  A court evaluating whether a defendant is entitled to qualified immunity must make two inquiries:  (1) "whether the facts that a plaintiff has alleged . . . or shown . . . make out a violation of a constitutional right"; and (2) "whether the right at issue

**B.     Doe's § 1983 Claims against the District**[2]

Defendants argue that the District is not liable under § 1983 because (1) McCray's actions do not violate Doe's substantive due process rights, (2) the District is not vicariously liable for McCray's alleged constitutional violations, and (3) Doe cannot establish a District custom or policy of failing to adequately train, supervise, or investigate employees that was causally linked to McCray's alleged constitutional violations.

In opposition to defendants' motion for summary judgment on the § 1983 claim against the District, Doe relies on the state-created danger doctrine outlined in DeShaney v. Winnebago Cnty. Dep't of Soc. Servs., 489 U.S. 189, 203 (1989).  In DeShaney, the Supreme Court concluded that because "the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them."  Id. at 196–97.  The Court did recognize, however, that under the following two narrow circumstances, state action liability might attach:  (1) "when the State takes a person into its custody and holds him there against his will," and (2) when

---

was 'clearly established' at the time of defendant's alleged misconduct."  Id. at 232 (citing Saucier v. Katz, 533 U.S. 194, 206 (2001)).  As outlined above, there is very little case law regarding the appropriate standard for a teacher's verbal abuse, even when coupled with physical conduct.  See Blake, 2005 WL 1377883, at *3 ("Guidance on what 'shocks the conscience' in a teacher-student sexual harassment case is scant.").  Short of molestation or sexual abuse, the law is not clearly established.  Therefore, McCray is entitled to qualified immunity.

[2]     Because McCray did not violate Doe's substantive due process rights, the District cannot be liable for failure to train, supervise, investigate, etc. under § 1983.  See Bridges ex rel. D.B. v. Scranton Sch. Dist., 66 F. Supp. 3d 570, 587 (M.D. Pa. 2014) ("[B]ecause [the plaintiff] was not deprived of an interest protected by the Fourteenth Amendment, Plaintiffs cannot recover from the District under § 1983 for its failure to train its teachers or principals.");  S. ex rel. Simpson v. Thorsen, 766 F. Supp. 2d 695, 703 (E.D. Va. 2011) ("[S]upervisors and municipalities cannot be liable under § 1983 without some predicate 'constitutional injury at the hands of the individual [state] officer,' at least in suits for damages." (quoting Waybright v. Frederick Cnty., Md., Dep't of Fire & Rescue Servs., 528 F.3d 199, 203 (4th Cir. 2008))).

the state itself creates the dangerous situation that resulted in a victim's injury—also known as the state-created danger doctrine.  Id. at 199–200.  The Fourth Circuit recently addressed the state-created danger doctrine in Doe v. Rosa and held that "[u]nder the narrow limits set by DeShaney and Pinder[ v. Johnson, 54 F.3d 1169 (4th Cir. 1995)], to establish § 1983 liability based on a state-created danger theory, a plaintiff must show that the state actor created or increased the risk of private danger, and did so directly through affirmative acts, not merely through inaction or omission."  795 F.3d 429, 439.

Doe argues that "the District should have known that its inaction, one-sided investigation, and failure to remove McCray from the cheerleading coach position violated [Doe's] constitutional right to be free from unjustified intrusions into her personal security and bodily integrity."  Pl.'s Resp. 11–12 (emphasis added).  Doe cannot make a § 1983 claim against the District because she cannot demonstrate that the District created or substantially enhanced the alleged danger that caused her harm.  Doe fails to allege any affirmative actions taken by the District that would have enhanced the risk that McCray would cause Doe harm.  Rather, Doe merely alleges that the District's omissions and inactions—specifically, failing to interview Doe or any witnesses to McCray's comments and failing to remove McCray from her position as cheerleading coach— create liability under § 1983.  The Fourth Circuit stated in Rosa that "a plaintiff must show that the state actor created or increased the risk of private danger, and did so directly through affirmative acts, not merely through inaction or omission."  Rosa, 795 F.3d at 439 (emphasis added).  Thus, the state-created danger doctrine does not apply under these circumstances, and the District is entitled to summary judgment as to Doe's § 1983 claim against it.

13

**C.     Doe's Title IX Claims against the District**

In her second cause of action against the District, Doe asserts a hostile education environment claim under Title IX, 20 U.S.C. § 1681.  Title IX states in relevant part: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a) (2004). Courts have looked to case law for Title VII of the Civil Rights Act of 1964 which addresses sexual discrimination in the workplace, see 42 U.S.C. § 2000e–2(a)(1) (2004), to establish what constitutes discrimination based on sex under Title IX.  Jennings v. Univ. of N. Carolina, 482 F.3d 686, 695 (4th Cir. 2007) ("We look to case law interpreting Title VII of the Civil Rights Act of 1964 for guidance in evaluating a claim brought under Title IX.").  Sexual harassment is recognized by Title VII and is therefore considered a form of discrimination under Title IX, including "hostile environment" sexual harassment as alleged in this case.  See Meritor Sav. Bank v. Vinson, 477 U.S. 57, 66 (1986) (Title VII action for hostile environmental sexual harassment); Davis Next Friend LaShonda D. v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 651 (1999) (citing Meritor in Title IX case).

The Fourth Circuit has stated that:

To establish a Title IX claim on the basis of sexual harassment, a plaintiff must show that (1) she was a student at an educational institution receiving federal funds, (2) she was subjected to harassment based on her sex, (3) the harassment was sufficiently severe or pervasive to create a hostile (or abusive) environment in an educational program or activity, and (4) there is a basis for imputing liability to the institution.

Jennings, 482 F.3d at 695.  The District stipulates that Doe was a student at an educational institution receiving federal funds.  Defendants argue, however, the Doe cannot establish that McCray's statements were "based on [Doe's] sex" or that McCray's conduct was so severe or pervasive that they created a hostile or abusive environment. Defendants further argue that the District was not deliberately indifferent and that punitive damages are not recoverable under Title IX.[3]

### 1.     Severe and Pervasive

Defendants first argue that McCray's "saggy boobs" comment is not based on sex as required under Jennings and is therefore not actionable.  It is unnecessary for the court to determine whether the comments were based on Doe's sex because the record is void of any evidence from which as reasonable jury could determine that McCray's actions were sufficiently severe and pervasive to rise to a Title IX violation.

"Harassment reaches the sufficiently severe or pervasive level when it creates 'an environment that a reasonable person would find hostile or abusive' and that the victim herself 'subjectively perceive[s] . . . to be abusive.'"  Jennings, 482 F.3d at 696 (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993)).  "Whether gender-oriented harassment amounts to actionable (severe or pervasive) discrimination 'depends on a constellation of surrounding circumstances, expectations, and relationships.'"  Id. (quoting Davis, 526 U.S. at 651).  The court must examine all the circumstances including "the positions and ages of the harasser and victim, whether the harassment was frequent, severe, humiliating, or physically threatening, and whether it effectively

---

[3] Doe concedes that punitive damages are not recoverable under Title IX.  Pl.'s Resp. 20.

deprived the victim of educational opportunities or benefits." Id. "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminat[ion]." Id. (quoting Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998)). "Common sense, and an appropriate sensitivity to social context, will enable courts and juries" to identify conduct that is objectively hostile or abusive. Id. (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81–82 (1998)). "These standards for judging hostility are sufficiently demanding to ensure that Title VII [and by extension, Title IX] does not become a general civility code . . . . Properly applied, they will filter out complaints attacking the ordinary tribulations of [educational institutions], such as sporadic use of abusive language, gender-related jokes, and occasional teasing." Faragher, 524 U.S. at 788 (internal quotations and citations omitted).

Doe uses Jennings in support of her argument that McCray's alleged sexual harassment was sufficiently severe and pervasive to support her Title IX claim. In Jennings, the Fourth Circuit overturned the district court's holding that the sexual harassment was not sufficiently severe or pervasive. The male soccer coach of the women's UNC soccer team continually sexually harassed players almost daily, including questioning the players about their sex lives, accusing players of promiscuity, overtly displaying affection toward one player, using graphic comments about the physical attributes of other players, and harassing a lesbian player about her sexual preferences. Jennings, 482 F.3d at 697–98. The court recognized that the soccer coach "was and still is the most successful women's soccer coach in U.S. college history, and . . . thus had tremendous power and influence over a player's opportunity for achievement in the soccer world, both at UNC and beyond." Jennings, 482 F.3d at 696. The court found this

16

disparity in power and control instructive and held that the plaintiff "proffered sufficient facts for a jury to find that [the coach's] degrading and humiliating conduct was sufficiently severe or pervasive to create a sexually hostile environment." Id. at 698. The court stated that while its "conclusion takes into account the informal, sometimes jocular, college sports team atmosphere that fosters familiarity and close relationships between coaches and players[,] . . . Title IX is not a civility code for the male coach who coaches women, and it is not meant to punish such a coach for off-color language that is not aimed to degrade or intimidate." Id. However, under the circumstances, the court found that if the plaintiff's "version of the facts is believed, [the coach] took advantage of the informal team setting to cross the line and engage in real sexual harassment that created a hostile or abusive environment." Id. at 699.

Unlike the facts alleged in Jennings, McCray's comments and actions as alleged are not sufficiently severe or pervasive to support a Title IX claim. Beyond the differing ages between McCray and Doe, none of the other circumstances surrounding their interactions establish a hostile environment. The alleged harassment—consisting of one comment followed by allegedly rude behavior that singled Doe out—was not frequent, severe, or physically threatening. Although Doe decided to quit the cheerleading squad, she did so after more than a year and a half after the incident. There is no indication that her grades suffered or that she performed poorly in school as a result of the incident. McCray was Doe's cheerleading coach and likely had a closer, more relaxed, and informal relationship with the cheerleaders than other teachers; however, unlike the soccer coach in Jennings, McCray did not cross the line or take advantage of her close relationship with the cheerleaders. McCray's "saggy boobs" comment, although

17

certainly inappropriate and unnecessary, constitutes "simple teasing" or an "offhand comment." <u>Faragher</u>, 524 U.S. at 788. While the inappropriate nature of McCray's comments is undeniable, the court finds that her actions do not constitute sexual harassment actionable under Title IX.

### 2.     Deliberate Indifference

Further, Doe cannot establish that the District was deliberately indifferent to her complaints regarding McCray. "An institution can be held liable for a Title IX violation only if 'an official who . . . has authority to address the alleged discrimination and to institute corrective measures . . . has actual knowledge of discrimination in the [institution's] programs and fails adequately to respond' or displays 'deliberate indifference' to discrimination." <u>Jennings</u>, 482 F.3d at 700 (quoting <u>Gebser v. Lago Vista Indep. Sch. Dist.</u>, 524 U.S. 274, 290 (1998)).

When Evans first received Ms. Doe's complaint, he immediately contacted McCray to confront her about the allegations. He instructed McCray not to speak to the cheerleaders about anything unrelated to cheering and not to discuss the matter again. Once he received the second complaint from Ms. Doe about the incident before the Friday night football game, Evans reported the incident to the Superintendent and Deputy Superintendent of the District. The District immediately placed McCray on administrative leave and suspended cheerleading practice. The District's Human Resources Department conducted an investigation, led by Morris, a female who was familiar with the cheerleading team. Morris determined that while McCray's statements were inappropriate and reflected a lack of judgment, they did not warrant termination. After the initial investigation, the District's Title IX Coordinator reviewed Morris's

18

findings and also found McCray's comments inappropriate but warranting only the two-week suspension and a verbal reprimand.  The Title IX Coordinator also determined that McCray's comments did not constitute sexual harassment or bullying.  Further, the District placed another adult in a supervisory role over practice to monitor McCray's interactions with Doe and the other cheerleaders.  Tester Depo. 25:18–20.  There is absolutely no indication that the District was deliberately indifferent under these circumstances.  Rather, the evidence in the record establishes that the District took reasonable steps to investigate Doe's complaints and took appropriate measures to ensure that the matter was adequately handled.

Doe argues that the District's failure to interview Doe or other cheerleaders who witnessed the incident was unreasonable.  However, Ms. Doe testified that she did not want Doe to be interviewed without her parents and that Doe had prepared a written statement and would provide the statement in lieu of an interview.  S. Doe Depo. 100:11–12 ("I didn't want her being interviewed without us, and so we offered a statement.").  Doe cannot now use her refusal to submit to an interview in her favor.

Because there is no genuine dispute of material fact as to whether McCray's actions were sufficiently severe and pervasive to constitute sexual harassment under Title IX and because there is no evidence that the District was deliberately indifferent to Doe's complaints, the court grants defendants' motion for summary judgment as it pertains to Doe's Title IX claim against the District.

### D.    Doe's State Law Claims Against the District and McCray

In addition to the federal causes of action, Doe brought the following state law causes of action against the District and McCray:  (1) negligence per se; (2) gross

19

negligence; (3) intrusion and invasion of privacy; and (4) injunction against the District. Although the court has supplemental jurisdiction over the state law claims, the court has the discretion to decide whether to retain jurisdiction over the state law claims after having granted summary judgment as to Doe's federal claims. Under 28 U.S.C. § 1367(c)(3), the court "may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . the district court has dismissed all claims over which it has original jurisdiction." See also Clinton v. Cnty. of York, 893 F. Supp. 581, 588 (D.S.C. 1995) ("[T]he court has discretion whether or not to exercise jurisdiction over pendent state-law claims once it has dismissed the federal claims to which the state-law claims had attached."). In United Mine Workers v. Gibbs, 383 U.S. 715, 726 (1966), the Supreme Court stated:

> [P]endent jurisdiction is a doctrine of discretion, not of plaintiff's right. Its jurisdiction lies in considerations of judicial economy, convenience and fairness to litigants; if these are not present a federal court should hesitate to exercise jurisdiction over state claims, even though bound to apply state law to them. Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.

Thus, the court should weigh the interests of comity and federalism to determine "the most appropriate course of action." Clinton, 893 F. Supp. at 588.

It is clear that the most appropriate course of action is to decline to exercise supplemental jurisdiction over Doe's state law claims and allow Doe to proceed in state court. The remaining claims all involve issues of South Carolina law, some of which are unsettled by South Carolina courts. Thus, the state court is the most appropriate forum to adjudicate Doe's remaining state law claims.

## IV.   CONCLUSION

For the reasons set forth above, the court **GRANTS** defendants' motion for summary judgment in part and **DISMISSES** plaintiffs' claims without prejudice.

**AND IT IS SO ORDERED**.

**DAVID C. NORTON**
**UNITED STATES DISTRICT JUDGE**

**October 9, 2015**
**Charleston, South Carolina**

21